IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION


MELANIE THOMAS                                                          PLAINTIFF


v.                              NO. 3:18-cv-00063 PSH


NANCY A. BERRYHILL, Acting Commissioner                    DEFENDANT
of the Social Security Administration


MEMORANDUM OPINION AND ORDER


Plaintiff Melanie Thomas ("Thomas") began the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, Thomas challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Thomas maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] Thomas so maintains for three reasons. First, the ALJ improperly weighed the medical opinions in the record. Second, the ALJ erred in assessing Thomas' residual functional capacity because the ALJ failed to account for limitations caused by Thomas' mental limitations; her difficulties reaching, handling, and fingering; and her seizure disorder and migraines. Last, the ALJ posed, and relied upon the answer to, an improper hypothetical question to a vocational expert.

---

[1]      The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ found at step one of the sequential evaluation process that Thomas has not engaged in substantial gainful activity since February 7, 2015, the alleged onset date. At step two, the ALJ found that Thomas has severe impairments in the form of "cervical and lumbar degenerative disc disease, osteopenia/joint pain, peripheral neuropathy, left shoulder rotator cuff tendonitis, history of Hepatitis C, history of seizure disorder, migraine headaches, hypertension, gastritis, chronic obstructive pulmonary disease (COPD), depressive disorder, anxiety disorder, and post traumatic stress disorder." See Transcript at 13. The ALJ assessed Thomas' residual functional capacity and found the following:

> … [Thomas] has the residual functional capacity to perform sedentary work …. except [she] would be restricted from any use of ropes, ladders, or scaffolds. [She] would be limited to no more than frequent fingering and handling with the non-dominant upper extremity. [She] could perform no more than frequent overhead reaching with the bilateral upper extremities. The work must not expose [her] to excessive exposure to dust, smoke, fumes, or other pulmonary irritants. The work must also not expose [her] to unprotected heights, around dangerous moving machinery, or require the use of firearms. [Thomas] would require the use of a cane for ambulation purposes and for getting to and from work. Nonexertionally, the work would have to be unskilled, limited to simple, routine, and repetitive tasks, with supervision that is simple, direct, and concrete. [She] has the ability to maintain frequent contact with co-workers, supervisors, and the public.

See Transcript at 16. The ALJ found at step four that Thomas is unable to perform her past relevant work. At step five, the ALJ obtained testimony, and answers to interrogatories, from a vocational expert and found that there is other work someone with Thomas' limitations could perform. The ALJ identified the work as "sorter" and "assembler." See Transcript at 30. Given those findings, the ALJ concluded that Thomas is not disabled for purposes of the Social Security Act.

I. THE ALJ'S WEIGHING OF THE MEDICAL OPINIONS IN THE RECORD. Thomas faults the ALJ for discounting the medical opinions of Dr. Robert Abraham, M.D., ("Abraham"), one of Thomas' treating physicians; Heather Oliver ("Oliver"), a licensed professional counselor who saw Thomas for individual therapy; and an unidentified person at Great River Pain Management Center. Thomas maintains that the error was compounded when the ALJ accorded too much weight to the opinions of the state agency medical professionals.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). In making the assessment, the ALJ is required to consider the medical opinions in the record and resolve any conflicts among the opinions. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Michel v. Colvin, 640 Fed.Appx. 585 (8th Cir. 2016). The ALJ may discount a treating physician's medical opinions if other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions that undermine the credibility of his opinions. See Id. "[W]hether the ALJ grants a treating physician's opinion[s] substantial or little weight, the regulations … provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) [quoting 20 C.F.R. 404. 1527(d)(2)].

A. <u>Abraham's opinions</u>. On January 6, 2016, Abraham signed a "To Whom It May Concern" letter in which he represented that "… Thomas is being treated in our office for lumbar and cervical radiculopathy" and is "unable to work at this time …" <u>See</u> Transcript at 1176. In April, June, and August of that year, Abraham signed "To Whom It May Concern" letters containing identical representations. <u>See</u> Transcript at 1313, 1412, 1454. During the period, Abraham certified that Thomas required a special license plate for her automobile because she had difficulty walking. <u>See</u> Transcript at 502.

On January 16, 2017, or after the administrative hearing, Abraham signed a fifth "To Whom It May Concern" letter. <u>See</u> Transcript at 1514. In it, Abraham represented that Thomas should avoid bending, twisting, or stooping; was unable to do household chores; and should not lift, push, or pull more than about twenty-five pounds.

On April 6, 2017, or after the ALJ's decision, Abraham signed a sixth "To Whom It May Concern" letter. In it, Abraham reiterated his previous findings and added the following: "Minimal activity causes increased pain to [Thomas'] neck, thoracic spine, and lumbar spine. When ambulating, she must use a cane or walker to help with stability and to prevent falls." <u>See</u> Transcript at 294.

On November 29, 2017, Abraham signed a medical source statement-physical. <u>See</u> Transcript at 150-151. In it, Abraham identified Thomas' impairments as lumbar radiculopathy, cervical radiculopathy, and bilateral carpal tunnel syndrome. Abraham opined, <u>inter alia</u>, that Thomas could stand and walk for less than a total of two hours in a workday, could sit for less than a total of two hours in a workday, could not reach in all directions for more than about one-third of a workday, but could frequently handle and finger.

4

The ALJ credited Abraham's opinions as to Thomas' ability to lift, push, and pull but otherwise gave the opinions little weight. The ALJ provided the following reasons for doing so:

> … Dr. Abraham's expressed opinions are quite conclusory, providing very little explanation of the evidence relied on in forming his opinion. [He] apparently relied quite heavily on the subject report of symptoms and limitations provided by [Thomas] and seemed to uncritically accept as true most, if not all, of what [Thomas] reported. Although Dr. Abraham has treated [Thomas], there are no laboratory and/or diagnostic test results which he performed that demonstrate and/or support his opinion. Dr. Abraham did not cite to any detailed physical examinations of [Thomas] during actual treatment visits with him. Dr. Abraham notes that [Thomas] is disabled due to cervical and lumbar radiculopathy, yet all EMG and nerve conduction testing has shown that she does not have radiculopathy … Dr. Abraham notes that [Thomas] cannot do household chores, yet she admitted in her disability paperwork that she does laundry … In fact, she told her therapist that she was mowing the yard and weed-eating in June and September 2016, just a few months prior to Dr. Abraham's letter stating [Thomas] was unable to these things … In light of the above, Dr. Abraham's own treatment notes do not reflect the degree of impairment suggested by his statements. Dr. Abraham's opinions are not well supported by the record and are inconsistent with the evidence of record as a whole. Finally, the last opinion of Dr. Abraham was rendered in January 2017, yet it appears that he had not seen [Thomas] since August 2016, more than five months prior to issuing his opinion. This fact further lessens the weight given to his opinion due to recency issues and [the] fact that her condition could have markedly changed over a five-month period.

See Transcript at 26-27.

One of the reasons the ALJ gave for discounting Abraham's opinions is not compelling, i.e., Abraham signed his January of 2017 "To Whom It May Concern" letter five months after last seeing Thomas, and her condition "could have markedly changed over a five-month period." The ALJ otherwise gave good reasons for weighing the

opinions as he did, and the reasons are supported by substantial evidence on the record as a whole.

Although the Court recognizes that Abraham's "To Whom It May Concern" letters and medical source statement-physical are but parts of a larger record and should be read in the context of the record, the ALJ could and did discount the lion's share of Abraham's opinions because he offered no medical evidence to support the opinions. In fact, it is not clear what medical evidence Abraham relied upon in formulating the opinions. He did not cite any medical evidence in his six "To Whom It May Concern" letters and merely listed Thomas' impairments in the medical source statement-physical. Abraham made no mention of any laboratory or diagnostic testing and made no mention of the findings from his examinations of Thomas. In short, one is left to guess what Abraham might have relied upon in formulating his opinions.

Alternatively, the ALJ could and did discount the lion's share of Abraham's opinions because they are inconsistent with the record as a whole. The Court will not catalogue every such inconsistency, save to note that the opinions are inconsistent with the medical testing and the findings and observations of other physicians. For instance, Dr. Mario Cauli, M.D., ("Cauli") saw Thomas on February 19, 2015, or twelve days after the alleged onset date, and Cauli's findings are unremarkable. See Transcript at 731-733. Cauli ordered an MRI of Thomas' spine, and the results revealed a normal cervical spine. See Transcript at 734-735.

Abraham's opinions are inconsistent with the April 23, 2015, findings of Dr. David Diffine, M.D., ("Diffine"), who was seeing Thomas for her complaints of depression, anxiety, and pain. See Transcript at 935-938. At the presentation, Diffine observed that

although Thomas complained of pain, she had a normal gait and normal range of motion, and a neurological examination was within normal limits.

Diffine ordered an MRI of Thomas' lumbar spine, which was performed on July 14, 2015. The results showed "[m]ild diffuse disc osteophyte complex L5-S1 with small central disc protrusion," "[m]ild degenerative endplate changes with small chronic Schmorl's nodes T11 and L3," and a "[s]mall right paracentral disc protrusion and annual fissure L4-5." See Transcript at 986. MRI testing of Thomas' hips and cervical spine was performed on subsequent occasions, and the results revealed, in part, mild degenerative changes in her hips and degenerative disc disease in her cervical spine. See Transcript at 1083, 1203.

Abraham's opinions are inconsistent with the March 3, 2016, findings of Dr. Alan Kraus, M.D., ("Kraus") of Great River Medical Center. See Transcript at 1419-1420. Kraus noted that an MRI of Thomas' cervical spine had been performed, and the results were normal. Although Kraus noted that an MRI of Thomas' lumbar spine revealed degenerative disc disease, Kraus did not believe there was "much objective evidence to rationalize giving [Thomas] high doses of narcotics."

Abraham's opinions are inconsistent with the findings made by Dr. Ron Schecter, M.D., ("Schecter") on May 17, 2016. In a progress note from that day, Schecter reported the following:

> [Thomas] was significantly overweight. She walked with the use of the cane with a stiff walking gait with a mild limp on the left side. Both lower extremities were grossly neurovascular intact. She had pain significantly out of proportion. As I just approached her to examine her and gently put my hand on her knee she complained of exquisite pain and pulled away. I really could not get an effective exam because anywhere I touched her on her left lower extremity she complained of severe pain. With any

> attempted active or passive motion she complained of severe pain … I saw her leg back and flex and extend her hip without any apparent discomfort, but when I tried to flex her hip 20 [degrees] she complained of excruciating pain. …

See Transcript at 1337. X-rays of Thomas's pelvis and left hip showed minimal degenerative changes to her hip joint but were otherwise normal. Schechter opined that Thomas' "issues" were potentially more neurogenic or psychosomatic.

Abraham's opinions are inconsistent with the results of an August 10, 2016, nerve conduction study and EMG of Thomas' lower extremities and her upper left extremity. The results revealed "moderate sensory polyneuropathy of the [bilateral lower extremities]" and "moderate left ulnar entrapment at the elbow," but no evidence of "myopathy or radiculopathy." See Transcript at 1498.

Abraham's opinions are inconsistent with the results of an MRI and CT scan of Thomas' cervical spine performed in 2017. See Transcript at 148, 169. The results of the testing were largely unremarkable.

Last, Abraham's opinions are inconsistent with some of the daily activities Thomas admitted she could perform. Although he opined that she could not perform any household chores, she acknowledged having done laundry and some yard work on more than one occasion.

B. Oliver's opinions. Oliver saw Thomas on several occasions for Thomas' complaints that included depression and anxiety. On December 10, 2015, Oliver wrote Diffine regarding Thomas' care. In the letter, Oliver represented, in part, the following:

> I have been seeing … Thomas since 12/2/2014. During this time, she has been diagnosed with Depressive Disorder, Unspecified; Anxiety Disorder, Unspecified; and Posttraumatic Stress Disorder. During the past year, … Thomas has been working through the grief of the death of her mother, as well as talking about the abuse that she has experienced, which has

> caused a considerable amount of anxiety for her. She states that she is
> taking 10mg of Valium currently and I was wondering if she could possibly
> go up to 20mg, at least for the next few months, because of the holidays
> and the anniversary of her mother's death. …

See Transcript at 1136. In April, June, and September of 2016, Oliver signed "To Whom

It May Concern" letters. See Transcript at 1310, 1414, 1457. In the letters, Oliver

represented that Thomas continued to be seen regularly by her physicians, Oliver

continued to see Thomas weekly for therapy, and Oliver did not believe Thomas was

capable of working.

The ALJ accorded little weight to Oliver's opinions. The ALJ so weighed the

opinions because Oliver is not an acceptable medical source; her opinions are

conclusory and "devoid of any explanation, rational, clinical findings, or reference to

objective testing," see Transcript at 27; and intrude upon an issue reserved for the

Commissioner.

The ALJ could and did discount Oliver's opinions because she is a licensed

professional counselor and, as such, is not an acceptable medical source. See Lawson

v. Colvin, 807 F.3d 962 (8th Cir. 2015) (licensed professional counselor not acceptable

medical source). Instead, Oliver is an "other source." The ALJ could and did also

discount Oliver's opinions because they are conclusory, and Oliver offered little to

support her opinions. In the letter to Diffine and the "To Whom It May Concern" letters,

Oliver simply identified Thomas' impairments, outlined her treatment regiment, and

opined that she is unable to work. Moreover, Oliver's opinions could be discounted

because they intrude upon an issue reserved for the Commissioner, i.e., whether

Thomas is able to work.

C. The opinions of the unidentified person at Great River Pain Management Center. On March 3, 2016, Thomas was seen by Kraus for an evaluation. Kraus recorded Thomas' medical history to include the following:

> … [Thomas] complains of shoulder pain, upper back pain, lower back pain, knee pain, and hip pain that goes back at least 20 years. She was abused by her husband and injured one of her shoulders. She has gone to physical therapy and has been on hydrocodone for over a year now. I reviewed her CSMD profile and note that she has received narcotics from other prescribers … Her cervical MRI is normal. Her lumbar MRI demonstrates a disc osteophyte complex and a central disc protrusion at L5-S1 and a right paracentral disc protrusion and annual fissure at L4-5. MRI of her left shoulder reports a small tear of the supraspinatus tendon with subacromial fluid and possibly adhesive capsulitis. She also has a peripheral neuropathy. …

See Transcript at 1419. Kraus diagnoses included degenerative disc disease of the lumbar spine. Given Thomas' cervical and lumbar MRIs, Kraus saw "not much objective evidence to rationalize giving [Thomas] high doses of narcotics." See Transcript at 1420.

On January 19, 2017, an unidentified person at Great River Pain Management Center signed a work/school excuse form. See Transcript at 1517. In it, the author opined that Thomas has multiple disabilities and was unable to return to work.

The ALJ accorded no weight to the opinions of the unidentified person at Great River Pain Management Center and did so for the following reasons:

> … First, it is unclear who issued the opinion as the signature is illegible. Secondly, the last time [Thomas] visited Great River Medical Center was in March 2016. At that time, she saw Dr. Kraus, who stated there was "not much objective medical evidence to rationalize giving [Thomas] high doses of narcotics." At that visit, Dr. Kraus diagnosed lumbar degenerative disc disease but noted [Thomas'] motor testing was normal … The opinion issued in January 2017 clearly is not signed by Dr. Kraus. There is no evidence showing any further treatment at the clinic from March 2016, when [Thomas] saw Dr. Kraus, to January 2017, when the opinion was issued. … [T]his opinion is quite conclusory, providing no explanation

10

> whatsoever of the evidence relied on in forming the opinion. … [Thomas] takes care of her personal grooming and hygiene. She does some household chores …

<u>See</u> Transcript at 27.

The ALJ could and did discount the opinions of the unidentified person at Great River Pain Management Center because it is unclear who signed the work/school excuse form containing the opinions. The ALJ could and did also discount the opinions because they are conclusory and offer nothing to support the opinions. The author simply noted that Thomas has "multiple disabilities" and is "unable to work." The author made no mention of any laboratory or diagnostic testing and made no mention of any findings from an examination of Thomas. Even if the opinions are viewed in the context of the record as a whole, the ALJ could and did discount the opinions because they are inconsistent with the record. Specifically, the opinions are inconsistent with, <u>inter alia</u>, the medical testing, some of the findings and observations of the medical professionals, and Thomas' daily activities. Moreover, the opinion that Thomas is unable to return to work intrudes upon an issue reserved for the Commissioner

D. <u>The opinions of the state agency medical professionals</u>. Thomas' medical records were reviewed by state agency medical professionals in connection with her applications for disability income benefits and supplemental security income payments. <u>See</u> Transcript at 327-342, 343-358, 361-383, 384-406. Dr. Martha Lauster, M.D., ("Lauster") reviewed Thomas' medical records and opined that Thomas was capable of performing light work with "hazard restrictions." <u>See</u> Transcript at 340. Dr. Rosey Seguin, M.D., ("Seguin") affirmed Lauster's assessment, although Seguin added a limitation for only occasional bilateral overhead reaching due to Thomas having been

11

diagnosed with a shoulder impingement. See Transcript at 378. Drs. Christal Janssen, Psy.D., and Kevin Santulli, Ph.D., reviewed Thomas' medical records and agreed that Thomas' mental impairments were not severe. See Transcript at 337, 374.

The ALJ accorded some weight to the opinions of the state agency medical professionals because the medical professionals "reviewed the file and they have expertise in their fields." See Transcript at 28. The ALJ found, though, that Thomas' limitations are greater than those found by the medical professionals.

The opinions of the state agency medical professionals are not entitled to great weight, and there is nothing to suggest that the ALJ accorded the opinions too much weight. He simply accorded some weight to the opinions. In fact, the ALJ disregarded portions of the opinions as he found that Thomas has greater limitations than the medical professionals found.

II. THOMAS' RESIDUAL FUNCTIONAL CAPACITY. Thomas next maintains that her residual functional capacity was erroneously assessed. Thomas maintains that the ALJ failed to account for limitations caused by Thomas' mental limitations; her difficulties reaching, handling, and fingering; and her seizure disorder and migraines.

The assessment of a claimant's residual functional capacity is made on the basis of all the relevant evidence in the record. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). The assessment must be supported by some medical evidence. See Id.

A. The limitations caused by Thomas' mental limitations. The ALJ found that Thomas' severe impairments include a depressive disorder, an anxiety disorder, and a post-traumatic stress disorder. The ALJ crafted a residual functional capacity that included the following non-exertional limitations: "the work would have to be unskilled,

limited to simple, routine, and repetitive tasks, with supervision that is simple, direct, and concrete." The ALJ nevertheless found that Thomas can maintain frequent contact with co-workers, supervisors, and the public.

The question for the ALJ was not whether Thomas has limitations caused by mental impairments but the extent to which they impact the most she can do. The ALJ incorporated limitations for Thomas' mental impairments into the assessment of her residual functional capacity but not to the extent she believes is warranted. She specifically maintains that, at most, she can only maintain occasional contact with the public. The ALJ could find as he did, though, because substantial evidence on the record as a whole supports his consideration of the evidence.

The record reflects that Thomas sought counseling for her mental impairments between December of 2014 and September of 2016.[2] The progress notes reflects that her mental status fluctuated during the period. Some portion of her poor mental status can be attributed to situational problems as she was understandably grieving the loss of loved ones. Thomas has limited contact with other people as she primarily interacts with her family, and she occasionally experiences outbursts in interacting with them.

A series of documents were completed in connection with Thomas' applications for disability insurance benefits and supplemental security income payments. See Transcript at 544-551, 567-574. Thomas is capable of shopping in stores but only does so about once a month. She has a limited social life and is unable to be around others. She did not attribute the lack of a social life to some mental impairment; instead, she

---

[2]     See Transcript at 1031-1034, 1035-1037, 1038-1041, 1128-1130, 1126-1127, 1124-1125, 1122-1123, 1120-1121, 1317-1318, 1315-1316, 1491-1492, 1489-1490, 1487-1488, 1484-1486, 1482-1483, 1480-1481, 1478-1479, 1476-1477, 1474-1475, 1472-1473, 1470-1471, 1468-1469, 1466-1467, 1464-1465, 1462-1463, 1460-1461.

attributed the lack of a social life to her "pain tolerance." See Transcript at 549. She does not like to be told "what to do in a harsh way" and becomes frustrated "when there is a lack of communication." See Transcript at 550.

Thomas testified during the administrative hearing about her depression, anxiety, and post-traumatic stress disorder. See Transcript at 83. She testified that she avoids crowded rooms and her father must accompany her to the store. She takes Valium, and it helps lessen the severity of her symptoms.

"It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence." See Dillon v. Colvin, 210 F.Supp.3d 1198, 1201 (D.S.D. 2016). In fact, "[a] reviewing court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision." See Id. [internal quotations and citations omitted]. Here, the evidence is capable of more than one acceptable characterization. Although the Court might have decided the case differently, the ALJ could find as he did with respect to the limitations caused by Thomas' mental impairments, specifically, her ability to maintain contact with the public.

B. Thomas' difficulties reaching, handling, and fingering. The ALJ found that Thomas' severe impairments include cervical and lumbar degenerative disc disease, osteopenia/joint pain, peripheral neuropathy, and left shoulder rotator cuff tendonitis. The ALJ crafted a residual functional capacity that included the following exertional limitations: "[Thomas] would be limited to no more than frequent fingering and handling with the non-dominant upper extremity. [She] could perform no more than

frequent overhead reaching with the bilateral upper extremities." The ALJ additionally found that Thomas requires the use of a cane for ambulation purposes and for getting to and from work.

The question for the ALJ was not whether Thomas has limitations caused by degenerative disc disease, joint pain, peripheral neuropathy, and tendonitis but the extent to which they impact the most she can do. The ALJ incorporated limitations for the impairments into the assessment of Thomas' residual functional capacity but not to the extent she believes is warranted. Thomas specifically maintains that she can only occasionally handle and finger and can only occasionally reach overhead. The ALJ could find as he did, though, because substantial evidence on the record as a whole supports the assessment.

Thomas' allegation that she can only occasionally handle and finger and only occasionally reach overhead is belied by the medical testing. For instance, a nerve conduction study and EMG of her lower extremities and her upper left extremity was performed on August 10, 2016. The results revealed "moderate sensory polyneuropathy of the [bilateral lower extremities]" and "moderate left ulnar entrapment at the elbow," but no evidence of "myopathy or radiculopathy."

The allegation is belied by the findings and observations made by Diffine, Kraus, and Schecter. For instance, Kraus did not believe there was "much objective evidence to rationalize giving [Thomas] high doses of narcotics." Schecter observed that Thomas' pain was significantly out of proportion to her impairments and speculated that her "issues" were potentially more neurogenic or psychosomatic. Thomas maintains that Abraham noted a limitation to no more than occasional reaching. It is true that Abraham

made such a finding, see Transcript at 150, but the ALJ could and did discount the finding because Abraham failed to offer any evidence to support the finding and because it is inconsistent with the record as a whole.

The allegation is also belied by the non-medical evidence. For instance, although Abraham opined that Thomas could not perform any household chores, Thomas acknowledged having done laundry and some yard work on more than one occasion.[3]

C. Thomas' seizure disorder and migraines. The ALJ found that Thomas' severe impairments include a history of a seizure disorder and migraine headaches. The ALJ crafted a residual functional capacity that included the following limitation: Thomas would be restricted from any use of ropes, ladders, or scaffolds, and the work must not expose her to "unprotected heights, around dangerous moving machinery, or require the use of firearms."

The question for the ALJ was not whether Thomas has limitations caused by a seizure disorder and migraine headaches but the extent to which they impact the most she can do. The ALJ incorporated limitations for one or both impairments into the assessment of Thomas' residual functional capacity but not to the extent she believes is warranted. Thomas specifically maintains that the impairments cause, "at a minimum, several days a month where … [she] would either be absent or not be able to fully concentrate for half the workday." See Docket Entry 11 at CM/ECF 18. In support of the assertion, Thomas cites Abraham's November 29, 2017, medical source statement-physical. In it, Abraham opined, in part, that on average, Thomas'

---

[3]    Thomas maintains that "[t]he ability to reach overhead bilaterally with upper extremities is … inconsistent with the ALJ's finding [that] … Thomas required the use of a cane for ambulation." See Docket Entry 11 at CM/ECF 18. The Court cannot agree.

impairments or treatment, and frequency of doctor's visits, would cause her to be absent from work more than three days a month. The ALJ could, though, properly discount that portion of Abraham's opinion for two reasons.

First, Abraham offered nothing to support his assertion that on average, Thomas' impairments or treatment, and frequency of doctor's visits, would cause her to be absent from work more than three days a month. Although the opinion should likely be read in the context of Abraham's progress notes, it is not clear what medical evidence he relied upon in formulating the opinion.

Second, Abraham's opinion is inconsistent with the record as a whole. In the approximately one-thousand page medical record, there are only a few months in which Thomas sought treatment on at least three occasions a month. Moreover, the bulk of Thomas' presentations were for counseling, and it is unclear how Abraham would have known of the frequency with which Thomas was seeking counseling services.

III. THE ALJ'S HYPOTHETICAL QUESTION. Thomas last maintains that the ALJ posed, and relied upon the answer to, an improper hypothetical question to a vocational expert. It is Thomas' assertion that the question failed to account for "the ALJ's finding … Thomas required a cane to get to and from work <u>and</u> to ambulate." <u>See</u> Docket Entry 11 at CM/ECF 19 [Emphasis in original]. Thomas additionally maintains that the question identified an individual who could perform frequent overhead reaching, but Thomas can only perform occasional overhead reaching.

Testimony from a vocational expert is substantial evidence on the record as a whole only when "the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." <u>See</u> <u>Taylor v.</u>

<u>Chater</u>, 118 F.3d 1274, 1278 (8th Cir. 1997). Thus, the hypothetical question must include all those impairments that are substantially supported by the record as a whole. <u>See</u> <u>Id</u>.

The ALJ crafted a residual functional capacity that included the following limitation: Thomas would require the use of a cane for ambulation purposes and for getting to and from work. The ALJ posed a hypothetical question to a vocational expert that included a limitation for use of a cane getting to and from the workstation. <u>See</u> Transcript at 90. The ALJ made no mention of use of a cane for ambulation purposes. Had the ALJ relied upon the answer to the question, the Court would likely agree that the ALJ's findings are not supported by substantial evidence on the record as a whole. The ALJ, though, did not rely upon the answer to that question.

After the conclusion of the administrative hearing, the ALJ sent the vocational expert a series of interrogatories. <u>See</u> Transcript at 646-651. In the interrogatories, the ALJ including the following limitation: "The individual would require the use of a cane for ambulation purposes and for getting to and from work." <u>See</u> Transcript at 647. The vocational expert reported that work as a "sorter" and "assembler" was available, <u>see</u> Transcript at 651, and the ALJ relied upon the answer to that interrogatory at step five. Thus, the answer relied upon by the ALJ at step five conformed to the assessment he made of Thomas' residual functional capacity.

The interrogatories did not include a limitation for occasional overhead reaching but instead included a limitation for "no more than frequent overhead reaching with the bilateral upper extremities." <u>See</u> Transcript at 647. The ALJ did not err when he relied upon the answer to a hypothetical question that included such a limitation. The

question need only include the impairments that are substantially supported by the record as a whole, and the ALJ could and did find that Thomas was not limited to only occasional overhead reaching.

Given the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Thomas' complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 20th day of February, 2019.


_____
UNITED STATES MAGISTRATE JUDGE